[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 19, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-15619

_____

D. C. Docket No. 03-02621-CV-B-S

SUSAN BALDWIN,

Plaintiff-Appellant,

versus

BLUE CROSS/BLUE SHIELD OF ALABAMA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(March 19, 2007)**

Before CARNES and MARCUS, Circuit Judges, and JORDAN,[*] District Judge.

CARNES, Circuit Judge:

_____

[*] Honorable Adalberto J. Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

Employers generally are liable for a supervisor's sexual harassment if the harassment is severe and pervasive enough to result in a hostile work environment amounting to discrimination prohibited by Title VII, 42 U.S.C. § 2000e et seq. There is, however, an affirmative defense, which the Supreme Court wrote into the law in Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998). The defense has two halves, one of which focuses on the employer's responsibility to prevent or correct workplace harassment, and the other of which focuses on the employee's responsibility to protect herself and others from harassment by using the procedures the employer has in place to promptly report it. To prevail under the Faragher-Ellerth defense, an employer must show not only that it fulfilled its responsibility, but also that the employee failed to fulfill hers. This appeal presents us with issues about both halves of that defense, some of which we have not addressed before.

## I.

The facts we consider are taken from our view of the evidence in the light most favorable to Susan Baldwin, the plaintiff who suffered summary judgment in the district court and is the appellant here. See Gitlitz v. Compagnie Nationale Air France, 129 F.3d 554, 556–57 (11th Cir. 1997). She began working for Blue

2

Cross in 1989, and became a marketing representative in the company's Huntsville, Alabama office in 1998. Scott Head became Baldwin's boss in November 2000 when Blue Cross promoted him from marketing representative to the position of district manager in Huntsville. There is no evidence that either of them had been involved in any reported incidents of sexual harassment before the events at issue here.

The record does not paint a complete picture of Head and Baldwin's professional relationship before he became district manager, but there are enough brush strokes that we can see that there were problems. We know, for example, that when Baldwin was first hired, Head told her: "Hey, Baldwin, look, the only reason you are here is because we needed a skirt in the office." Baldwin did not like Head calling all the women in the office "Babe," as in his characteristic greeting "Hey, Babe . . .," although she never complained about it. We also know that Baldwin believed Head had mistreated Blue Cross customers and acted unethically on occasion and she had openly supported another Huntsville staff member for the district manager's position that went to Head. The short of it is that the two had never been each other's biggest boosters.

Nonetheless, on the day Head's promotion to district manager was announced in November 2000, Baldwin stopped by his office to congratulate him.

3

Head told her to sit down and asked, "Hey, Babe, are you on my team?"  She told him that everyone in the Huntsville office was on his team and that she would continue to handle her responsibilities as she had.  Head replied:  "That is not the question that I asked you."  When Baldwin told him that she believed she had answered the question, Head stood up, leaned across the desk, and pointed his finger at her.  In what she describes as a "very raised tone of voice," Head said, "[t]hat's not the fucking question I asked you.  Are you on my team?"  As Baldwin puts it, the two of them "proceeded in a very lengthy discussion regarding whether or not I was on his, quote, fucking team."  Their talk was also about "power, authority, and respect."

Baldwin described this post-promotion discussion as a "follow up" to an earlier conversation in which she and Head had expressed different views about the same subject when Head was anticipating becoming district manager.  After he had said on that earlier occasion that he was looking forward to having the power and authority of a district manager, Baldwin told him "you may have the power and you may have the authority in this position [they were in the district manager's office], but as far as respect goes, you'll get that from people in the office based on . . . how you handle your job responsibilities."  This context reinforced Baldwin's view of Head's "on-my-team" inquiry as a demand for loyalty.

The discussion in question on that November day when Head became district manager ended after about thirty minutes with Head once more asking if Baldwin was on his team and Baldwin simply saying, "Yes, Scott, I'm on the team." Baldwin says that Head's behavior on that day made her feel "pretty threatened." She did not, however, complain to anyone about it, at least not then.

Over the next eight months, there were no problems. When Baldwin went in and asked Head something or if he had a question for her, in her view "everything was handled very professionally." Head did use some offensive language, but not in a threatening manner and not aimed at her specifically. As Baldwin would later explain in her deposition, "[p]rofanity can be used in different ways," and she agreed that "there is a difference in being cursed in front of and [being] cursed at." When pointedly asked, Baldwin testified that she could not recall a specific incident between November 2000 (the day of Head's promotion) and July 26, 2001 (the significance of that date will be apparent later) when she was cursed at "[i]n a threatening kind of manner." Baldwin also conceded that she had herself used profanity in the office, although not on a daily basis.

Head, by contrast, did eventually come to use profanity on a daily basis. And that may be an understatement. If, as John Marshall Harlan suggested, it is

5

"often true that one man's vulgarity is another's lyric," <u>Cohen v. California</u>, 403 U.S. 15, 25, 91 S. Ct. 1780, 1788 (1971), then Head was quite lyrical around the office. He regularly called the marketing representatives, who were all male with the exception of Baldwin, "cocksuckers" and "peckerwoods." For example, he would summon the marketing representatives into a meeting by saying, "Hey, you bunch of cocksuckers, hey, you bunch of peckerwoods, come in here. I need to talk to y'all." Or, during the meeting, he would ask, "Hey, you bunch of cocksuckers, how much business I got coming in?" Head regularly used the word "fuck" in general conversation, as in "what the fuck" or something along those lines. And Baldwin testified that Head used the term "bitch" to refer to women in general, although she could not provide many examples of Head's use of the word in that way. She did recall a single instance, when the two of them were marketing representatives, in which Head referred to a prospective client as a bitch. And she also recalled another instance in which Head, after he became district manager, referred to his wife as a "fucking bitch" (more about that later).

On Tuesday, July 26, 2001, Head along with Baldwin and other marketing representatives from the Huntsville office went to Birmingham for a banquet honoring top Blue Cross managers. After noticing Baldwin speaking to the company president, Head asked her what she had said. Baldwin told him that she

6

had spoken to the president favorably about Head's job performance, to which Head replied, "Thanks Babe, you take care of me, I take care of you."

Later, while the banquet speaker was talking, Head leaned over to Baldwin and invited her to forgo her return trip to Huntsville in favor of a night of dancing and partying that would include her staying in his hotel room in Birmingham. "No one will ever know," he assured her. Baldwin told Head, "Thanks, a lot, Scott, but I can't do that. I've got meetings tomorrow," or something along those lines. After the banquet was over, she drove to Huntsville.

While she was on the trip home, Head called her and urged her to spend some time with him that night. He told her that he was on his way back to Huntsville himself, was coming to her house, that she should just leave her garage door open, and that he would get some beer, pick her up, put the car top down, and they would "just cruise through Green Mountain, drink and play CDs." Baldwin told Head that she really appreciated the offer but had to decline. Head called her a couple of more times before she got home, and during one conversation when the connection was lost she may have called him back. As Baldwin was pulling into her driveway, Head called her and said that he was at her front door. We don't know for sure whether Head actually was at Baldwin's front

door, but she told him over the phone, "Scott, you just need to go home to your wife and kids." He responded, "All right, Babe. All right, Babe."

A few days later—Baldwin thinks it was the following Monday (which would have been July 31, 2001)—Head called her into his office. After she went in, he closed the door, walked behind her, and said "Hey, Babe, blow me," having moved so close to her that the only place for her to go was to fall backwards onto a couch behind her. Baldwin replied by asking Head if there was anything else that he needed her for. When Head replied "No," she got off the couch, retrieved a couple of M&M candies from a jar on Head's desk, and sat down in a chair in front of his desk. Right about then, Head asked Baldwin about her weekend. Baldwin told him that she and her husband had not done anything exciting, and asked Head what he had done over the weekend.

Head said: "Well, you know, we went out partying this weekend" and "that fucking bitch wife of mine, you know, she got tanked and we got home and she came pretty unglued and she came at me," and "I threw that fucking bitch on the floor." When Baldwin replied "What?," Head continued that he got his hands around his wife's neck but then realized that he should get out of his house. That frightened Baldwin, who realized she needed to leave Head's office. She then asked him where he had gone after he left his house, and Head told her he had

8

spent the night at the house of his ex-wife, who was out of town. As Baldwin later said, "And at that point, I realized that I was dealing with somebody who just wasn't quite right." She also had work to do and realized that Head was wasting her time, so she left his office. Baldwin says that she was afraid of Head at this point. But she did not report the conversation or her fears to any higher-up or to anyone in the Human Resources Department.

As Baldwin observed it, from that point on the situation in the office deteriorated. Head's cursing became part of his "standard, everyday . . . conversation in the office." There was also one occasion where Head, explaining his decision not to promote a certain female employee to the position of marketing representative, told Baldwin: "I need to hire a guy for this job, a Susan Baldwin, somebody who has balls like you do." He described the employee he was not going to promote as a "slut" and a "tramp." And, on several occasions around this time, Baldwin overheard Head crack a few jokes with some of her male colleagues about their wives. Head might say something like, "Yeah, your wife looked good this morning," or "Hey, I'm going over to your house this afternoon . . . . to see your wife."

At least twice during this period, Head approached Baldwin's desk and after getting Baldwin's attention with his trademark greeting "Hey Babe," unzipped his

pants fly and moved the zipper up and down. There were "two or three" times when Head would come up behind Baldwin, take a loud breath, say "Hey Babe," and breathe down her neck. Baldwin found Head's behavior offensive; it made her uncomfortable.

The behavior of some of Baldwin's other co-workers was not a model of propriety, either. Once a male colleague, first name Jeff, made a passing reference to his prospective customer "tickler file" in the presence of Baldwin and another co-worker, first name Kirk. After Jeff left, Kirk began playing with his penis through his pants and said to Baldwin, "tell Jeff to tickle this." Baldwin testified, "[i]t was just always like that."

Despite what Baldwin characterized as the "uncomfortable" situations and the "deteriorating" office conditions in August and September 2001, she did not file a complaint with anyone in the company, as Blue Cross' anti-sexual harassment policy and procedures required. Baldwin knew about the policy and procedures because she had periodically received training in them. The material parts of the policy in place during the relevant time provided:

> Our company's policy prohibits any type of harassment, violence, or threat of violence. Any employee who engages in this conduct is subject to termination.

10

> An employee who believes that he or she has been subject to harassment or violence in any form should report the incident or conduct immediately to his or her manager or to Employee Relations. . . . Employee Relations will promptly and thoroughly conduct an impartial investigation of the conduct. . . .

> The manager of Employee Relations . . . will investigate reports, assess and evaluate risks and implement actions to remedy potentially threatening or violent situations.

Baldwin eventually shared her concerns about all of the vulgar language with her secretary, and she told at least two of her co-workers about Head's propositions. She made no attempt, however, to report anything to Employee Relations—which everyone called Human Resources. Career considerations kept her from making a report. She didn't believe at the time that her job was in jeopardy, and she didn't want anything to appear in her personnel file or on her record that could get in the way of a future promotion. As she explained it, her strategy in response to the harassment was to "just go along to get along."

Baldwin began to rethink that strategy not because of any change in the amount of harassment, but because of disputes involving prospective clients and the amount of a bonus check she received. The bonus check she received was for $2,000, but she thought it should have been for $3,000. On the morning of Monday, September 24, 2001, Baldwin walked into Head's office, put the check on his desk, and asked him to do something about it. Head said that he had no

control over the amount of the check. Baldwin asked Head if she needed to talk with Tommy Hudgins, who, as Vice President for Sales, was Head's superior. As Baldwin put it, "And at that point, I challenged him on the issue, and he really pretty much came unglued with me." She testified:

> He looked at me and said, [a]re you fucking stupid? Excuse me. He said, Don't you ever fucking go over my head. You'll fucking lose your job, with his finger pointed in my face as he's screaming at me.

After hearing that, Baldwin told Head: "You know what, Scott, I'm done with you. I'm done."

Sometime during their conversation that morning, Head told Baldwin that she was on the verge of insubordination, to which Baldwin replied, "You know what, Scott, if you think I'm insubordinate, why don't you just fire me?" After confronting Head, she walked out of his office to go to an appointment, telling a co-worker along the way that this was the last straw, that she had taken all she could take. She felt that what she had gone through that morning had been "very, very demeaning, very demeaning."

Later that afternoon, Head called Baldwin into his office and tried to make amends. He told her he was uncomfortable with how the morning had gone, to which Baldwin responded that it was obvious he did not care about her perspective. She told him that he had missed an opportunity to manage, to which

12

he responded "in no uncertain terms" that she should not tell him how to manage. The next morning Head told Baldwin that he had called his superiors on her behalf about the bonus issue, but he again reiterated that she was "never to go above his head."

After the exchanges with Head about her bonus check, Baldwin came to believe that her situation at Blue Cross was "pretty miserable," because she was subject to the whims of a "manipulative and controlling" boss. She believed that Head controlled her destiny within the company, and interpreted his remarks as a threat. She feared that she would lose her job, and was convinced she would if she ever went over Head's head. Baldwin had a good relationship with and the utmost respect for Hudgins (Head's supervisor), but she did not report any of this to Hudgins or to anyone else in Blue Cross management for another month and a half.

Two incidents during the next month and a half led to Baldwin finally filing an internal complaint about Head. The first occurred on October 1, 2001, when Head assigned a prospective client to another marketing representative before hearing Baldwin's side of the dispute. Baldwin took this occasion to "confront" Head about the "circus-like conditions in the office," to accuse him of leaking confidential information about her prospects to other representatives, and to tell

13

him that she no longer trusted him. Baldwin explained to Head that during the first six months after his promotion, in her words, "he had won me over based on his actions, but once [he] knew that he had won me over, things deteriorated." The deterioration she referred to was the noise and the "goofing around" occurring in an office with cubicles instead of individual offices. Head dismissed Baldwin's complaints about the poor workplace conditions as "bullshit," but he did call her later that day to apologize about her prospect information being leaked and promised that it would not happen again.

The last incident in the downward sliding relationship between the two also involved a dispute about a prospective client. On October 29, 2001, Baldwin called Head for help. She and another co-worker had gotten into a quarrel about a prospective client, during which the co-worker yelled at her and accused her of being nothing but a problem to everyone in the office. During the call to Head, Baldwin told him what had happened, reiterated her concerns about the circus-like conditions in the office making it difficult to work, and said she would no longer tolerate being yelled at and was "tired of the vocabulary that's being used" around her. Head assured Baldwin that she was not a problem, and as she put it, tried to build her up by reminding her that he had asked her to represent the company at numerous functions and had bragged about her to others. He agreed with her that

14

it was not appropriate to use profanity in the workplace and assured her that he would talk with the co-worker with whom she had the angry dispute earlier that day.

A meeting was arranged for later that afternoon, but when Baldwin showed up for it at Head's office the offending co-worker was not there. Instead, there was another employee present, which Baldwin took as a sign that Head was planning to counsel her, although he never called it a counseling session. Head told Baldwin that he valued her, that he had always tried to promote her, that he had told many people she was the best salesperson in the office, and that the only problem he had with her was earlier that month involving the dispute over her bonus check. But Head also told Baldwin that people in the office found her to be unapproachable and intimidating. And, in an apparent reference to Baldwin's criticisms about the office atmosphere, Head said that he did not understand her view and told her that "[w]e teach people how to treat us." Uncharacteristically, Baldwin mostly kept quiet during this meeting, sensing that she "wasn't supposed to talk."

Head assigned the disputed prospective client to Baldwin's male co-worker, but, a few days later, asked Baldwin to go to lunch. The lunch with Head, which took place on November 6, 2001, was in Baldwin's view "purely a 'temperature

check,'" to see if Baldwin was "OK" and to pacify her. By this time, Baldwin was not okay, but, in her words, she "[didn't] say a word." Two days later, on November 8, 2001, Baldwin finally complained to the Blue Cross Human Resources Department. She met with Emma Barclay of that department and submitted a five-page written synopsis of the conduct she found offensive that had happened since Head's promotion a year earlier. The events referred to in the synopsis and the time that had passed since they occurred are (although the synopsis did not enumerate them in this fashion): (1) the "on-my-team" conversation in Head's office (12 months earlier); (2) Head's proposition at and after the banquet in Birmingham (more than three months earlier); (3) the "Hey Babe, Blow me," incident (about three months earlier); (4) the bonus check controversy (about seven weeks earlier); (5) the prospective client disputes (the month before); and (6) the lunch that Baldwin and Head had together (two days earlier).

The synopsis that Baldwin gave Barclay also included a paragraph entitled "August 2001," which stated in its entirety:

> The conditions are deteriorating in the office. I am very uncomfortable with the unprofessionalism that is being display [sic] by Scott, and also other members of the staff. Scott repeatedly addresses the Marketing Reps as "Cocksuckers and Peckerwood." He uses the word "fuck" on a regular basis. This type of vocabulary is now being consistently used in the office. It makes me very

16

uncomfortable. It is now difficult for me to even be in the office around Scott. I feel that his conduct is now affecting my ability to perform my job while in the office.

The breathing and zipper incidents were not mentioned in the synopsis, but Baldwin told Barclay about them. The two women spoke for about an hour that day, with Baldwin going through all the notes she had made. According to Baldwin, Barclay listened attentively to her, seemed shocked, and promised to take everything to Rick King, who was then the Blue Cross Vice President of Human Resources and a compliance officer.

On November 27, 2001, King and Barclay, along with Sharon Heaton, the company's Manager of Associate Resources, traveled from Birmingham to Huntsville to investigate Baldwin's allegations. They interviewed Head and three other members of the Huntsville office they thought might have relevant information. One of those three, Bud Smith, was the long-time office manager in Huntsville who would have been in the office at virtually all times during the work day, unlike sales personnel who were often out making calls. Smith was described by another interviewee as being very perceptive, knowing the "pulse" of the office, and being the "ear" to many associates in Huntsville. King thought that Smith would be a "very good and objective witness."

King himself interviewed two of the four potential witnesses including Head, while the two women on the investigating team interviewed one each. The interviews took place in a restaurant near the Huntsville office, with each of the four people being interviewed in different parts of the restaurant or at different times. The result of the questioning of the three people other than Head was that none of them corroborated Baldwin's charges, except that one of the three did say that he had heard offensive language in the Huntsville office. According to Barclay's notes, what the man said about the profanity was that "[e]veryone use[d] it including Susan B."

Barclay's notes also indicate that the answers of one of the employees who was questioned seemed "rehearsed" and that he mentioned Baldwin's name almost before the first question was asked. Barclay later testified that the man's answers did not seem rehearsed, but it did appear that he had come in knowing what the subject matter of the questioning was going to be.

In his answers to King's questions that day, Head admitted using the term "peckerwood" as a nickname for one of the male marketing representatives in the Huntsville office, but he otherwise denied all of Baldwin's allegations. King did not take notes during his interview of Head. He suggested to Head during the interview that the relationship between him and Baldwin could benefit from some

18

outside assistance. King believed that Head seemed open to the possibility of working out his differences with Baldwin.

Where Blue Cross is not able to substantiate complaints of sexual harassment, it is King's practice to warn the accused employee that "if the conduct was true or had been true or if like conduct is proven true in the future, that they will be subject to disciplinary action, up to and including termination." He gave Head that warning both before and after the conclusion of the investigation.

The three members of the investigating team discussed the results of the interviews during the drive back to Birmingham. According to King, they "preliminarily [concluded] that there was no merit to the charges or the contentions that [] Baldwin was making" because they hadn't heard anything to support her allegations. Barclay testified that she turned her notes from the interviews over to King but that the discussion on the drive back was "[j]ust a general conversation but nothing in depth." Her role in the case ended after that.

Baldwin first learned about the results of the investigation on November 29, 2001, which was a couple of days after the Human Resources team's visit to Huntsville, when Baldwin met with King while in Birmingham for some other Blue Cross event. King told Baldwin that no one had corroborated her complaint. She insisted that her charges were true and demanded that Head be fired. King

19

explained that the company did not have sufficient evidence to do that, and he proposed instead to enlist the assistance of an expert to counsel them and monitor their interactions in order to prevent any future problems. The person he had in mind was an industrial psychologist, Dr. Buddy Seay, whom the company had used successfully in similar cases in the past.

As Baldwin recalled the conversation, King had asked her, in effect, whether she would be willing for the company to work with Head to "mold and shape his behavior." She wasn't willing and rejected King's proposed solution, telling King that she "could not work for Scott." Given what she knew to be Head's past behavior, Baldwin thought that the counseling "was not anything that I thought that I should have to be a part of."

On December 7, 2001, Baldwin met with her old boss Tommy Hudgins, the Vice President for Sales. Hudgins offered Baldwin another means of remedying any problems she was having with Head, which was that she could be a marketing representative in the Birmingham office. Baldwin refused this proposal as well, again saying, "I can't work for Scott" and explaining that her family, friends and clients were located in and around Huntsville. That was the second time she had refused a solution that the company offered.

The third time came in another meeting with Hudgins, which took place on December 10, 2001. In that meeting, Baldwin said that she was not going to participate in counseling with Head and the outside psychologist or accept a transfer to Birmingham. As a result, Hudgins placed Baldwin on administrative leave and instructed her to stop doing company business.

Later that same week, King gave Baldwin another chance to choose between counseling and a transfer, and for the fourth time Baldwin refused to cooperate. She reiterated that she would not work for Head or transfer to Birmingham. As a result, King sent Baldwin a letter demanding her resignation, citing her refusal to work with the relationship counselor in Huntsville or to accept the transfer, and offering her a more generous severance arrangement than she was entitled to receive. Baldwin refused to resign and was terminated, with the enhanced severance arrangement, effective December 20, 2001.

## II.

In the litigation that followed, Baldwin sued Blue Cross for sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, -3, alleging that Head's harassing behavior created a hostile work environment and that she was fired in retaliation for reporting it. Baldwin also alleged that Blue Cross was liable to her on state law claims of invasion of

privacy, intentional infliction of emotional distress, and negligent retention, supervision, and training. After discovery, the parties cross-filed motions for summary judgment. The court denied Baldwin's motion for partial judgment and granted Blue Cross' motion for judgment as to each of Baldwin's claims.

With respect to the hostile environment claim, the district court concluded that the alleged incidents of harassment were not sufficiently severe or pervasive to constitute sexual harassment and that, in any event, Blue Cross had established the affirmative defense provided in Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998). As for the retaliation claim, the court concluded that Blue Cross had proffered a non-retaliatory reason for firing Baldwin, and she had not put forward evidence to support a finding of pretext. Finally, regarding the state law claims, the court determined that Head's conduct was not sufficiently extreme to constitute an invasion of privacy or an intentional infliction of emotional distress and, in the absence of an underlying tort, the conduct could not be the basis for a claim for negligent training, supervision, or retention.

In this appeal Baldwin challenges the district court's judgment as to all of her claims.

## III.

Title VII prohibits sex-based discrimination that alters the terms and conditions of employment. 42 U.S.C. § 2000e-2(a)(1). The forbidden alteration can be brought about in either of two ways. Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1245 (11th Cir. 2004). One is through a tangible employment action, such as a pay decrease, demotion or termination. Id. The other way is through creation of a hostile work environment caused by sexual harassment that is sufficiently severe or pervasive to alter the terms and conditions of work. Id.

## A.

Although Baldwin's primary contention is that the terms of her employment were altered by a hostile work environment, she also claims that she suffered tangible employment action discrimination. To support that theory she points to two actions by Blue Cross, the first of which was the offer to transfer her to the Birmingham office in order to resolve the problems she and Head were having. An offer to transfer an employee, however, is not an employment action; it is merely an offer. Providing an employee with a choice about where she works does not change the terms or conditions of her employment.

The second action Baldwin contends was a tangible employment action is her termination. To be sure, termination is the ultimate change in the terms and

23

conditions of employment because it ends them. But termination will support a claim only if it was caused by discrimination. See Ellerth, 524 U.S. at 760, 118 S. Ct. at 2268 (noting that an employer is liable if its "discriminatory act results in a tangible employment action" (emphasis added)). There is no genuine issue of material fact about what caused Baldwin's termination. She refused to work with Head, who was the district manager in Huntsville; she refused to accept a transfer to Birmingham; and she refused to accept the company's offer to resolve the problem through counseling. On at least four occasions Baldwin was given the choice of accepting a transfer or participating in counseling, and each time she adamantly refused to accept either.

Firing an employee because she will not cooperate with the employer's reasonable efforts to resolve her complaints is not discrimination based on sex, even if the complaints are about sex discrimination. Were it otherwise, an employee would be free to refuse any reasonable remedy the employer offered to resolve her complaint. As we'll explain later in our discussion of Blue Cross' obligation under the Faragher-Ellerth defense, the offered remedy was reasonable.

**B.**

Having determined that Baldwin's tangible employment action theory for recovery under Title VII fails at the gate, we turn to her hostile environment

24

theory.  To establish her right to recover under this theory an employee need not show a tangible employment action, but she must show that she was harassed because of her sex, that the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment," and that there is some basis for holding the employer liable.  Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1279–80 (11th Cir. 2003); Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000); Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc); see Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S. Ct. 2342, 2347 (2004).

Although Baldwin complained to Barclay about Head's handling of her bonus check in September 2001 and the dispute with two male co-workers over prospective clients in October 2001, she does not now contend that Head's actions or inactions involving those matters amounted to harassment or other discrimination based on sex.

As part of the harassment she suffered, Baldwin points to the widespread use of profanity.  This is hardly a new problem.  In the second month of our independence, George Washington issued a general order to the Continental Army in which he bemoaned the fact that "the foolish, and wicked practice, of profane cursing and swearing . . . is growing into fashion."  General Orders on Profanity of

3 August 1776, in 5 The Papers of George Washington: Revolutionary War Series 551 (Philander D. Chase ed., 1993).  It was still in fashion two-and-a-quarter centuries later in Blue Cross' Huntsville office.  As our earlier description of the facts details, there was a lot of profanity, but the problem for Baldwin's discrimination case is that very little of it was aimed specifically at females.  Most of the curse words that were frequently used—"fuck," "fucking," "bullshit," "cocksucker," and "peckerwood"—are relatively gender-neutral.  And it is undisputed (Baldwin herself testified to it) that those curse words were used indiscriminately in front of, and towards, males and females alike.  It would be paradoxical to permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct.[1]

Title VII does not prohibit profanity alone, however profane.  It does not prohibit harassment alone, however severe and pervasive.   Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex.  Because "[a] claim of sexual harassment [under

---

[1] This principle might with some justification be called the Vince Lombardi Rule, if what one of his former players said about the great coach is true.  Henry Jordan, who played as a defensive tackle for the Packers, when asked how Lombardi treated his players, answered:  "[He] treats us all alike.  Like dogs!"  David Maraniss, When Pride Still Mattered: A Life of Vince Lombardi 377 (1999).  If so, no one could accuse Lombardi of discrimination, and what is true on the practice and playing fields is also true in the workplace.

Title VII] is a claim of disparate treatment," in order to prevail a plaintiff must show "that similarly situated persons not of [her] sex were treated differently and better." Mendoza, 195 F.3d at 1254 n.3 (Edmondson, J. concurring). An equal opportunity curser does not violate a statute whose concern is, as the Supreme Court has phrased it, "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 1002 (1998) (quotation omitted). Another way to put it, as the Supreme Court has, is that the statute does not enact "a general civility code." Id. at 81, 118 S. Ct. at 1002; accord Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1234 (11th Cir. 2006); Gillis v. Ga. Dep't of Corr., 400 F.3d 883, 888 (11th Cir. 2005); Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001); Gupta, 212 F.3d at 587.

Some of the profanity or swear words Head used were more sex specific, which is to say more degrading to women than to men. On one or two occasions Head used the term "bitch" to refer to women, although never in reference to Baldwin herself. A different time he referred to another employee as a "slut" and a "tramp." Somewhat sexually ambivalent was Head's attempt to compliment Baldwin by describing to her the kind of man he needed to hire for a particular

27

job: "a Susan Baldwin, somebody who has balls like you do." Giving Baldwin the benefit of the doubt, these comments may be considered, for whatever weight they have, on the sexual harassment scales.

As further evidence of sexual harassment, Baldwin points to Head and her fellow marketing representatives making sexually charged remarks or jokes about each others' wives, and to the occasion when a male co-worker made a suggestive remark about the prospective customer "tickler file" and played with his penis through his pants in her presence. When a plaintiff alleges that her employer is liable for the harassing conduct of co-workers instead of supervisors, the employer will be held liable only if it "knew or should have known of the harassing conduct but failed to take prompt remedial action." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002) (citing Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000)). There is reason to doubt whether Baldwin can meet that requirement here. In any event, the evidence is undisputed that after an administrative assistant in the Huntsville office complained to Head about the wife remarks and jokes, they stopped. For now, however, we can assume that this offensive behavior can be attributed to the company, because it will not matter to the result.

Some of Head's remarks and conduct toward Baldwin clearly were sexual in nature. He propositioned her at the Birmingham banquet and on her drive home from it. He cornered her in his office and propositioned her by saying, "Hey babe, blow me." He approached her on more than one occasion and said "Hey babe" while playing with his zipper. And he came up behind her two or three times, said "Hey babe" and breathed down her neck.

The question this part of the case comes down to is whether the sexually harassing conduct that Baldwin did experience during the thirteen months she worked under Head's supervision was "sufficiently severe or pervasive to alter the terms and conditions of [her] employment." Gupta, 212 F.3d at 582. The district court concluded that it was not, but that is a question we need not answer in light of our resolution of the issues involving the Faragher-Ellerth defense.

## C.

The Faragher-Ellerth defense is not available where the discrimination the employee has suffered included a tangible employment action. See Ellerth, 524 U.S. at 762–63, 765, 118 S. Ct. at 2269, 2270; see also Faragher, 524 U.S. at 808, 118 S. Ct. at 2293. As we have already explained, however, Baldwin did not suffer any tangible employment action as a result of the claimed sexual discrimination. The only arguable basis for recovery that she has is hostile

29

environment discrimination, and the Faragher-Ellerth defense is available to an employer defending against that type of Title VII claim.

An employer avoids liability under this defense if: (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) the employee "unreasonably failed to take advantage of any preventive or corrective opportunities [it] provided." Faragher, 524 U.S. at 807, 118 S. Ct. at 2293; Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270. Because it is an affirmative defense, the employer bears the burden of establishing both of these elements. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1313 (11th Cir. 2001). Baldwin contends that Blue Cross has established neither one, but we are convinced that it has established both.

As to the first element of the defense, Baldwin does not dispute that Blue Cross has a valid anti-discrimination policy prohibiting harassment, which was effectively communicated to all employees, nor does she dispute that there were reasonable reporting requirements and procedures of which she was fully aware. See generally Frederick, 246 F.3d at 1314 (listing requirements of a reasonable sexual harassment policy). The policy and procedures that Blue Cross had in place are substantially similar to others that we have upheld. See, e.g., Walton, 347 F.3d at 1287; Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1298–99

(11th Cir. 2000). Blue Cross' policies and procedures not only were in place but had been used to fight harassment in the past. Rick King, the Vice President of Human Resources who was in charge of investigating the complaint Baldwin filed, had personally been involved in at least a half dozen investigations of sexual harassment complaints. In the ones where the allegations proved to be true, disciplinary action, up to and including termination, had been taken.

According to Baldwin, the policy and procedures and how they had been applied in the past is not the problem; the problem is how the company applied them in her case. In the words of Faragher and Ellerth, the question is whether, once Baldwin complained, Blue Cross "exercised reasonable care to . . . correct promptly any sexually harassing behavior." Faragher, 524 U.S. at 807, 118 S. Ct. at 2293; Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270. A threshold step in correcting harassment is to determine if any occurred, and that requires an investigation that is reasonable given the circumstances. The requirement of a reasonable investigation does not include a requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser. Nothing in the Faragher-Ellerth defense puts a thumb on either side of the scale in a he-said, she-said situation. The employer is not required to credit the statements on the she-said side absent circumstances indicating that it

31

would be unreasonable not to do so.  Although it is not entirely clear, Baldwin does not seem to contest this point.

Instead, she contests the reasonableness of the investigative procedures used by the company in her case.  Baldwin argues that there were five deficiencies in the investigation:   (1) Rick King, who was in charge of the investigation, failed to speak personally with her during it; (2) King failed to take notes during his interview with Head; (3) the interview of Baldwin's colleagues from the Huntsville office took place in the same restaurant where Head was present (although in a different part of the restaurant); (4) the discussion that took place between King and the two other members of the investigative team after the interviews was not thorough enough; and (5) not enough weight was given to the notes taken by Emma Barclay, a member of the investigative team, indicating that the responses of one of the interviewed employees seemed rehearsed (although Barclay testified in deposition that his answers had not seemed rehearsed, but it appeared he knew in advance what he would be questioned about).

For two reasons we reject Baldwin's contention that what she describes as shortcomings in the investigation render it unreasonable for Faragher-Ellerth purposes.  The first reason is there is nothing in the Faragher or Ellerth decisions requiring a company to conduct a full-blown, due process, trial-type proceeding in

32

response to complaints of sexual harassment. All that is required of an investigation is reasonableness in all of the circumstances, and the permissible circumstances may include conducting the inquiry informally in a manner that will not unnecessarily disrupt the company's business, and in an effort to arrive at a reasonably fair estimate of truth. See Carr v. Allison Gas Tubine Div., Gen. Motors Corp., 32 F.3d 1007, 1012 (7th Cir. 1994) ("It is difficult for an employer to sort out charges and countercharges of sexual harassment among feuding employees . . . .").

The investigation that Blue Cross conducted at least meets minimum standards for this type of case. It was conducted by the head of the company's Human Resources Department, who was experienced in such matters, and he was assisted by two other members of that department. They not only interviewed Baldwin and Head but also other employees of the Huntsville office whom they had reason to believe would have witnessed the harassment if it had occurred. They did interview Head and the other employees at the same location, but those interviews were conducted separately. Although King himself did not personally interview Baldwin, another member of the investigative team, Emma Barclay, had talked to Baldwin about her allegations for more than an hour, and King had the five-page written synopsis Baldwin submitted.

33

We will not hold that the investigation does not count, as Baldwin urges us to, because the investigators did not take more notes, because the discussion among them was not more thorough, or because they did not give more weight to a particular factor, such as Barclay's initial impression that the answers of one of the employees seemed rehearsed. To second guess investigations on grounds like those would put us in the business of supervising internal investigations conducted by company officials into sexual harassment complaints. We already have enough to do, and our role under the Faragher and Ellerth decisions does not include micro-managing internal investigations. Instead, we look only to the overall reasonableness of the investigation under the circumstances, and this investigation was reasonable.

The second independently adequate reason we reject Baldwin's contention that shortcomings in the investigation Blue Cross undertook render the Faragher-Ellerth defense inapplicable is the result. We have held that even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the defense is still available if the remedial result is adequate. Walton, 347 F.3d at 1288 ("[W]here the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow."). In other words, a

reasonable result cures an unreasonable process. It does so because Title VII is concerned with preventing discrimination, not with perfecting process. See Faragher, 524 U.S. at 805–06, 118 S. Ct. at 2292 (Title VII's "primary objective, like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm." (internal quotation marks omitted)).

Baldwin, however, contests the reasonableness—primarily the adequacy of—the remedial measures Blue Cross offered her. Of course, with human beings there are no guarantees, but it is enough if the remedial measure is "reasonably likely to prevent the misconduct from recurring." Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996) (internal quotation marks omitted) (quoting Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir. 1990)).

Even if we assume that transferring Baldwin to Birmingham was not a proper remedial measure because of the hardship it would have imposed on her, the transfer was just one of the options she was given. Blue Cross also offered to have Dr. Seay, an industrial psychologist on contract with the company, conduct a counseling program with Baldwin and Head and monitor their relationship. Dr. Seay was an expert in the area and had successfully done that sort of thing for Blue Cross before, and the company had no reason to believe that he could not succeed this time.

35

Counseling is the first-step corrective measure required by the nation's largest employer, the federal government, in all cases of sexual harassment. See 29 C.F.R. § 1614.105(a) ("Aggrieved persons who believe they have been discriminated against on the basis of . . . sex . . . must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter."). We are unwilling to hold, as Baldwin would have us, that a warning to the alleged harasser coupled with counseling of both parties and monitoring is not an adequate corrective remedy to begin with where, as here, the employer could not corroborate the allegations.

We have held that warnings and counseling of the harasser are enough where the allegations are substantiated. See Fleming v. Boeing Co., 120 F.3d 242, 246–47 (11th Cir. 1997) (talking to the harasser and telling the complainant to report any further problems was, as an initial measure, enough to constitute "immediate and appropriate corrective action"); id. at 247–48 (giving the harasser a verbal warning and transferring the complainant to a different work group in the same facility also constituted "immediate and appropriate corrective action"); accord Gawley v. Ind. Univ., 276 F.3d 301, 306–07, 311–12 (7th Cir. 2001) (issuance of "counseling memorandum" to the harasser was sufficient); Intlekofer v. Turnage, 973 F.2d 773, 779–80 (9th Cir. 1992) (lead opinion) (noting that

counseling may be a sufficient remedy "as a first resort"); see also Skidmore v. Precision Printing & Packaging, Inc., 188 F.3d 606, 615 (5th Cir. 1999) ("What is appropriate remedial action will necessarily depend on the particular facts of the case . . . [including] the effectiveness of any initial remedial steps." (quoting Waltman v. Int'l Paper Co., 875 F.2d 468, 479 (5th Cir. 1989))).

Because warning the harasser and counseling him ordinarily is enough where the employer is able to substantiate the allegations, it certainly follows that the same remedy is enough where it is not able to do so. Here, although Blue Cross wasn't able to substantiate Baldwin's allegations, it could tell that there was hostility between her and Head. Where the employer sees hostility but cannot tell if there has been harassment, warning the alleged harasser, requiring both parties to participate in counseling, and monitoring their interactions is a proper and adequate remedy, at least as a first step.

We will mention the obvious. This is not a case where the employer's first remedy proved inadequate, and it failed to take further action to correct the problem. It is instead a case where the complainant refused to cooperate with the first step. She did that because she was not happy with Blue Cross' proposed remedy. She not only refused to give Blue Cross' remedy a chance but also insisted that she would not work with Head again. As we have indicated before,

37

the complainant does not get to choose the remedy.  See  Farley v. Am. Cast Iron

Pipe Co., 115 F.3d 1548, 1555 (11th Cir. 1997).  This point is relevant to the

second element of the Faragher-Ellerth defense.

To establish the second element of the defense, the employer must show that

"the plaintiff employee unreasonably failed to take advantage of any preventive or

corrective opportunities provided by the employer or to avoid harm otherwise."

Faragher, 524 U.S. at 807, 118 S. Ct. at 2293; Ellerth, 524 U.S. at 765, 118 S. Ct.

at 2270.  An employee's failure to take advantage of preventive or corrective

measures can take two forms—not using the procedures in place to promptly

report any harassment and not taking advantage of any reasonable corrective

measures the employer offers after the harassment is reported.  Either failure is

sufficient to establish the second element of the defense, and in this case we have

both.  As our preceding discussion shows, Baldwin refused to take advantage of

the counseling option, a reasonable corrective measure which Blue Cross offered

her, and that by itself is enough to carry the day for Blue Cross on the second

element of the Faragher-Ellerth defense.

Even if Baldwin had not refused to cooperate with the corrective measure

Blue Cross offered after she finally reported the alleged harassment, her failure to

report the harassment sooner would establish the second element of the defense.

38

She had a prompt reporting duty under Blue Cross' policy, which provided that: "An employee who believes that he or she has been subject to harassment or violence in any form should report the incident or conduct immediately to his or her manager or to Employee Relations." An employee must comply with the reporting rules and procedures her employer has established. See Frederick, 246 F.3d at 1314 (citing Madray, 208 F.3d at 1302; Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1365 (11th Cir. 1999) (per curiam)).

And, more importantly, Baldwin had a prompt reporting duty under the prophylactic rules the Supreme Court built into Title VII in the Faragher and Ellerth decisions. The rules of those decisions place obligations and duties not only on the employer but also on the employee. One of the primary obligations that the employee has under those rules is to take full advantage of the employer's preventative measures. The genius of the Faragher-Ellerth plan is that the corresponding duties it places on employers and employees are designed to stop sexual harassment before it reaches the severe or pervasive stage that amounts to discrimination that violates Title VII. See Ellerth, 524 U.S. at 764, 118 S. Ct. at 2270 (limiting employer liability where the employee fails to comply with reporting requirements "encourage[s] employees to report harassing conduct before it becomes severe or pervasive" and serves Title VII's deterrent purpose).

39

But that design works only if employees report harassment promptly, earlier instead of later, and the sooner the better.

Baldwin waited too long to complain. Her complaint came three months and two weeks after the first proposition incident and three months and one week after the second one. That is anything but prompt, early, or soon. See, e.g., Walton, 347 F.3d at 1289–91 (an employee's reporting delay of two and a half months after the first incidents of harassment was too long for Faragher-Ellerth purposes). Baldwin argues that her delay in reporting the harassment was reasonable because she had good reasons for not doing so sooner. An employee in extreme cases may have reasons for not reporting harassment earlier that are good enough to excuse the delay, see Frederick, 246 F.3d at 1314, but the ones that Baldwin puts forward are not.

Baldwin says that she waited to file her complaint until November 8, 2001—three months after the solicitation in Head's office at the very end of July—because she feared being fired and felt that silence would best serve her career interests. Her goal, she testified, was to "just go along to get along." While we have recognized that filing a sexual harassment complaint may be "uncomfortable, scary or both," Walton, 347 F.3d at 1290 (quoting Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 35 (1st Cir. 2003)), we have also explained

that, "'the problem of workplace discrimination . . . cannot be [corrected] without the cooperation of the victims.'" Id. (quoting Madray, 208 F.3d at 1302 (omission and alteration in original)). The Faragher and Ellerth decisions present employees who are victims of harassment with a hard choice: assist in the prevention of harassment by promptly reporting it to the employer, or lose the opportunity to successfully prosecute a Title VII claim based on the harassment. See Reed, 333 F.3d at 35.

Every employee could say, as Baldwin does, that she did not report the harassment earlier for fear of losing her job or damaging her career prospects. As the First Circuit has explained, the Supreme Court undoubtedly realized as much when it designed the Faragher-Ellerth defense, but it nonetheless decided to require an employee to make the choice in favor of ending harassment if she wanted to impose vicarious liability on her employer. See id. Were it otherwise, the Faragher-Ellerth defense would be largely optional with plaintiffs, and it would be essentially useless in furthering the important public policy of preventing sexual harassment.

For these reasons, we conclude that Blue Cross has established both elements of the Faragher-Ellerth defense, and on that basis the district court's grant of summary judgment is due to be affirmed.

41

## IV.

We turn now to Baldwin's Title VII retaliation claim, see 42 U.S.C. § 2000e-3(a), which is based upon her allegation that she was fired because she complained about Head's sexual harassment. Baldwin relied on circumstantial evidence, and in considering her claim the district court applied the analytical framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).[2] Blue Cross proffered as its non-retaliatory reason for firing Baldwin her insistence that she would not work with Head, and her repeated refusals to either accept the company's proposal for counseling and monitoring or a transfer to the Birmingham office. Finding no genuine issue of material fact about that, the district court granted summary judgment against Baldwin.

As our discussion of the tangible employment action issue in Part III.A above indicates, we agree with the district court that there is no genuine issue of fact about the reason Baldwin lost her job, and the reason is exactly what the district court said: Baldwin refused to cooperate in the company's reasonable

---

[2] For the first time on appeal, Baldwin argues that a December 14, 2001 letter from King to her constitutes direct evidence of unlawful retaliation, and that the McDonnell Douglas burden-shifting framework is for that reason inapplicable. We do not ordinarily consider arguments raised for the first time on appeal. See Tanner Adver. Group, L.L.C v. Fayette County, Ga., 451 F.3d 777, 787 (11th Cir. 2006) (en banc). In any event, our examination of the letter reveals that it does not provide any direct evidence of retaliatory intent (or even circumstantial evidence for that matter).

attempt to solve the problem. Her argument that Blue Cross' reasons for firing her are pretextual is that she really did not mean what she repeatedly said about not being willing to work with Head. She argues that because what she said about refusing to work with Head was not true, Blue Cross cannot rely on those statements as a basis for firing her. In effect, she is attempting to transfer her dishonesty to the company: she lied to the company, so its reliance on her lie must itself be a lie.

If arguments had feelings, this one would be embarrassed to be here. It faults an employer for taking an employee at her word. Having insisted on three different occasions that she would not work with Head, we will not listen to Baldwin complain that Blue Cross believed her. Baldwin's "had-my-fingers-crossed" argument fails because what counts is not what she believed about her stated intent but what the decision maker at Blue Cross believed, see Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999), and there is no genuine issue of fact about that. The evidence is uniform and strong that King, who fired Baldwin, believed she meant what she said about not working with Head. Besides, failure to cooperate in an employer's reasonable corrective action is a non-retaliatory reason for termination, and Baldwin does not contend that she was bluffing when she said she would not cooperate in the proposed

counseling and monitoring. That by itself is enough to support the grant of summary judgment.

The district court's grant of summary judgment to Blue Cross on this claim was correct.

## V.

Baldwin's final contentions are that the district court erred in granting summary judgment for Blue Cross on her state-law invasion of privacy, intentional infliction of emotional distress, and negligent training, supervision, and retention claims. We agree with the district court that there is no genuine issue of material fact as to an essential element of each of these claims.

As to the invasion of privacy and intentional infliction of emotional distress claims, a plaintiff in Alabama must show that the defendant's conduct was so outrageous that it caused the plaintiff mental suffering, shame, or humiliation (for invasion of privacy) or that it cannot be tolerated in a civilized society (for intentional infliction). McIssac v. WZEW-FM Corp., 495 So. 2d 649, 651 (Ala. 1986). Assuming that Head did everything that Baldwin said he did, his harassment of Baldwin was not sufficiently outrageous as a matter of Alabama law for either claim. See id. at 651–52 (granting summary judgment in favor of

employer on plaintiff's invasion of privacy and intentional infliction claims where plaintiff alleged facts similar to those alleged by Baldwin here).

As to Baldwin's negligence claims, she must show that Blue Cross had actual knowledge of Head's harassment and did nothing about it (for negligent retention) or would have known about the harassment had it exercised due and proper diligence (for negligent training and supervision). See Stevenson v. Precision Standard, Inc., 762 So. 2d 820, 824 (Ala. 1999); Thompson v. Havard, 235 So. 2d 853, 858 (Ala. 1970). Head, like all Blue Cross employees, had received a copy of and was trained in the company's sexual harassment policy. There is no evidence that Blue Cross knew or had reason to suspect that Head was harassing Baldwin or anyone else until she reported it.

When Blue Cross had received reports of harassment by other employees in the past, and been able to substantiate the allegations, it had taken disciplinary action up to and including termination. And once Blue Cross received Baldwin's report of harassment, it investigated and attempted to remedy the problem even though it was unable to substantiate her allegations. In other words, there is no basis in Alabama law for holding Blue Cross liable for Head's alleged actions.

**AFFIRMED.**

45